**E-FILED on** 10/4/2011

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DONALD HOLLAND,<br><br>         Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner,<br>Social Security Administration,<br><br>         Defendant. | No.  C-10-02317 RMW<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT<br><br>**[Re Docket Nos. 16, 17]** |

Claimant Donald Holland ("Holland") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of a final decision by the defendant Commissioner of Social Security (the "Commissioner") denying Holland's claims for disability insurance benefits and supplemental security income payments under the Social Security Act.  Holland is appealing the ALJ's finding that he is not disabled as defined by the Act because his visual impairment is "not severe" and also the finding he can perform his past relevant work as a security guard and a merchandiser.  Specifically, Holland contends the ALJ erred by: (1) rejecting Dr. Syverain's opinion regarding his vision, and (2) by not obtaining the D.O.T. code for his past job as a merchandiser.  Holland is also challenging the ALJ's credibility finding.  Holland seeks reversal of the disability determination and a remand for further administrative proceedings.

The matter is now presented before the court on the parties' cross-motions for summary judgment. Having considered the papers submitted by the parties and the administrative record of proceedings before the agency, the court denies Holland's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

## I.  BACKGROUND

### A. Procedural History

Holland has filed two applications for Social Security Disability Insurance Benefits and Supplemental Security Income. The first application filed in August 2004 was denied, and is not at issue in the instant appeal. Administrative Transcript ("Tr.") 9. The second application was filed on April 2, 2007 alleging the onset of his disability began on various dates, including October 1, 2002, and January 1, 2007. Tr. 69, 113. Holland later amended the onset date of his disability to July 2007. Tr. 31. Following the denial of this claim initially and on reconsideration, Holland timely requested a hearing. The hearing was held on May 13, 2009 before an Administrative Law Judge ("ALJ"). Tr. 17. On June 18, 2009, the ALJ found that Holland was not disabled because he could perform his past work as a merchandiser and as a security guard. Tr. 6-16. Holland then requested a review by the Appeals Council of the ALJ's decision. Tr. 4. The Appeals Council denied the request, finding no reason for additional review of the ALJ's decision. Tr. 1. Accordingly, the ALJ's decision became the Commissioner's final decision. *Id.* Holland filed the instant complaint on November 18, 2010.

### B. Holland's Age, Educational, and Vocational History

Holland, born on October 11, 1958, is currently 52 years old and was 50 years old on the alleged disability onset date. Tr. 38. He completed two years of college and has had no other type of special job training or trade school. Tr. 124. Holland has worked as a material handler, security guard, and merchandiser. Tr. 26, 119.

### C. Holland's Medical History

In April of 2007, Holland visited the emergency room complaining of severe eye pain behind his left eye combined with blurred vision. Tr. 192. The treating physician did an examination of his eyes and found his eyes were "normal to inspection," "round and reactive" and the Fundoscopic

1  exam[1] normal. Tr. 193.  For treatment, Holland was given Advil and told to follow up with his
2  treating physician. *Id.*  Holland saw an Eye Clinic three days after his emergency room visit, where
3  he had "normal visual acuity" and "cotton wool spots likely secondary to increased blood pressure."
4  Tr. 189, 259.  Holland saw Richard Ehling, M.D., in May 2007 for a follow up appointment and
5  stated he did not have any eye pain that day but had it "off and on." Tr. 186.  Dr. Ehling's report
6  stated the headache and eye pain were "much improved with better diabetes control and hydration."
7  *Id.*

8  Holland had an eye exam on July 9, 2007 with James D. Palmer, M.D., who diagnosed
9  Holland with an  "increased cup-to disc ratio, both eyes," and "non proliferative diabetic retinopathy,
10 both eyes." Tr. 233.  The doctor also said Holland "does not have significant macular edema" and is
11 "at high risk for developing glaucoma" although he did not have glaucoma yet. *Id.*  One week later,
12 on July 14, 2007 Holland had an independent medical examination, paid for by the Department of
13 Social Services. Tr. 242.  This examination, performed by Nicholas Leeper, M.D., found Holland
14 had "no relevant visual . . . limitations." Tr. 247.  This examination also found that Holland was able
15 to stand, sit or walk for an eight-hour workday, and should be able to "lift and carry 20 pounds
16 frequently." *Id.*  In a separate Case Analysis completed one month later on August 16, 2007, a
17 different physician, Ernest Wong, M.D., found no established visual limitations and Holland's
18 "degree of functional limitations not supported by total eor." Tr. 260, 264.  This assessment was
19 ultimately adopted and affirmed in December 2007 by R. Tashjian, M.D., a DDS physician. Tr. 12.

20 In October of 2007, Holland saw J. Jue Dyron, M.D., at the San Mateo Medical Center, and
21 made no complaint of any eye pain, although he did complain of shoulder and back pain. Tr. 277.
22 Holland saw Dr. Dyron again in late October and made no complaints of eye pain; however the
23 doctor did find that his type 2 diabetes was uncontrolled and worse than before. Tr. 297.  On or
24 about November, 2007, Holland was evaluated by Milliardaire Syverain, M.D., who completed a
25 Disability Insurance Benefits Claim for him. Tr. 279.  Dr. Syverain stated Holland had "severe

---

[1] A fundoscopic examines the eye for deficiencies or abnormalities, and is particularly used as the exam for diagnosing retinopathic disorders.
http://www.ncbi.nlm.nih.gov/books/NBK221/

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS
MOTION FOR SUMMARY JUDGMENT —C-10-02317 RMW
NMJ                                                       3

visual impairment" as a result of his non proliferative retinopathy. *Id.* This was the only appointment Holland had with Dr. Syverain. *Id.* When Holland saw Dr. Dyron for a follow up appointment in December, he made no complaint of eye pain or visual impairment, although the doctor found his diabetes was "uncontrolled" and "worse." Tr. 294. When Holland saw Dr. Dyron again one month later in January 2008, he also did not complain of eye pain. Tr. 293. Also in January 2008, Holland saw Jeanette Aviles, M.D., a doctor he had seen previously in 2006. He did not complain of eye pain; however, the doctor noted his history of possible early glaucoma. Tr. 303. Dr. Aviles' record for Holland's next appointment in February shows he stated he saw an eye specialist and "received drops that require some type of authorization." Tr. 302. The record does not elaborate on what authorization was needed, only stating that Holland had not yet received the drops and had not begun to take them. Holland's appointment with Dr. Dyron in February was similar, with no mention of eye pain, nor any other symptoms. Tr. 292.

**D. Holland's Hearing Testimony**

At the May 13, 2009 hearing, Holland testified the last time he was employed was in 2007. Tr. 27. Leading up to his unemployment, Holland testified, he worked at Stanford Hospital delivering medical supplies throughout the hospital. Tr. 27. During the time he worked at Stanford Holland stated he went through a "bad divorce" and that it "got real strenuous on me working at a high pace like that." Tr. 26. Holland further stated that physically, the job was hard on his lower back, and that he started to experience blurred vision. Tr. 27. Holland stated that his diabetes and his blurred vision became worse over time from this point on. *Id.* Holland left the hospital job to work as a security guard, which he stated was "more light duty." Tr. 26.

Holland then described the physical problems he had during his time as a security guard. Holland stated he had problems at night, specifically making sure doors were locked or unlocked. Tr. 28. He stated it was difficult for him to "see certain areas because it was real dark in certain areas." Tr. 29. When asked if his vision has became worse since he left the security position, he answered yes. *Id.* After his work as a security guard, Holland worked as a merchandiser, stocking magazines on shelves at a grocery store. Tr. 28. During that position he stated it "takes a while for my vision to focus, you know, like I couldn't really grasp what I needed to pick up at the time until

1 I'd really try to concentrate." Tr. 28. Holland left the merchandiser job in 2007, after three or four
2 months. *Id.* During the past year, Holland testified he experienced sharp pains in his eyes when he
3 sleeps. Tr. 30. He also stated he has trouble concentrating on items, making it hard for him to
4 remember items he has seen because he cannot see them clearly in the first place. Tr. 30.

5 Holland testified that he was living with a woman who "ha[s] some vision problems" so he
6 "put[s] eye drops into her eyes," "drive[s] her to the store," and "take[s] her to church on Sundays."
7 Tr. 32. When asked if he was receiving care for his vision, he replied that he had an appointment
8 with an eye clinic later that same month. Tr. 31. A vocational expert then testified at the hearing as
9 to the skill level of Holland's three occupations. Tr. 34. He described them as semi skilled or
10 unskilled, and light work, none of which conferred any skills which would transfer to sedentary
11 work. Tr. 34-35.

**E. The ALJ's Five-Step Sequential Evaluation Decision**

13 The ALJ found Holland to be "not disabled" at the fourth step of the disability determination
14 process. *See* 20 C.F.R. § 404.1520.

15 At step one, the ALJ determined that Holland had not engaged in substantial activity since
16 January 1, 2007, the alleged onset date of his disability. Tr. 11. At step two, the ALJ found Holland
17 had several severe impairments including: diabetes, mild diabetic neuropathy, and high blood
18 pressure. Tr. 11-12. At step three, the ALJ determined Holland did not have an impairment or
19 combination of impairments that meets or medically equaled a listed impairment. Tr. 12. When
20 determining Holland's residual functional capacity, the ALJ looked at a cumulation of the record
21 provided. The ALJ noted the doctor who diagnosed Holland with retinopathy opined he was able to
22 lift and carry twenty pounds, stand, sit or walk to at least six hours and had no manipulative
23 limitations. Tr. 12. Additionally, although Holland had medical insurance and had blurred vision, he
24 did not yet have glasses. Tr. 14. The ALJ further noted that Holland had no mental impairments
25 which would cause any limitation on his daily living, and similarly, these mental impairments, if
26 any, were not treated for a continuous period of twelve months. Tr. 14.

27 At step four, the ALJ found Holland was able to perform his past work both as a security
28 guard or merchandiser. The ALJ found Holland has the residual functioning capacity to: lift and

1  carry ten pounds frequently, twenty pounds occasionally; stand and/or walk for six hours of an eight
2  hour workday; sit for six hours of an eight hour work day; and is precluded from constant use of the
3  hand for fingering and feeling, but could however, use his hands frequently for fingering and feeling.
4  Tr. 14-15.  The ALJ noted discrepancies between Holland's assertions of impairments and, among
5  many things, "degree of medical treatment sought, the diagnostic tests and findings made," and the
6  "level of restrictions on the claimant in most of the physician opinions." Tr. 15.  Based on the
7  descriptions of the vocational expert describing Holland's previous positions as a security guard and
8  a merchandiser, and the evidence by DDS physicians and Holland's treating physicians, the ALJ
9  found Holland could perform his past work in either of these positions. Tr. 16.

## II. LEGAL STANDARD

The district court's review of the ALJ's decision is limited.  The Commisioner's determination denying benefits will be upheld "if it is supported by substantial evidence and is based on the proper legal standards."  *See* 42 U.S.C. § 405(g); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993) (citing *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990)).  "The decision will be set aside, however, if the proper legal standards were not applied in weighing the evidence and making the decision even though the findings are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978)).  The Ninth Circuit in *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997), defined "substantial evidence" and described the relevant standard of review:

> Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine whether substantial evidence supports the ALJ's decision, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion.  Where the evidence is susceptible to more than one rational interpretation, we must uphold the Commissioner's decision.

*Sandgathe*, 108 F.3d at 980 (internal citations and quotation marks omitted).

## III. ANALYSIS

Plaintiff alleges that the ALJ: (1) improperly classified Holland's visual impairment as "not-severe" after he rejected the opinion of Dr. Syverain; (2) failed to adequately develop the record by

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT —C-10-02317 RMW
NMJ                                              6

1  not obtaining a D.O.T. code for the "Merchandiser" job Holland held; and (3) improperly rejected
2  Holland's testimony.

### A. Severity of Visual Impairment

Holland contends that the ALJ improperly determined that his visual impairment was "not severe." Motion at 5. Holland further contends the ALJ erred by concluding that Dr. Syverain's opinion about Holland's visual impairment emanated from a position of "advocacy." Motion at 5.

The Commissioner argues the ALJ's determination was supported by substantial evidence provided in the record. Cross Motion at 12. The Commissioner contends that since there was substantial evidence to support his finding that Holland's vision was not severely impaired, whether or not Dr. Syverain's opinion emanated from a place of advocacy is not determinative of the outcome. *Id.* 12-13.

The Commissioner correctly argues there was substantial evidence to support the ALJ's finding that Holland was not severely visually impaired. The record provided is replete with documentation from Holland's personal treating physicians, as well as state authorized medical evaluations, a majority of which do not mention any visual impairment at all. Holland was diagnosed with non proliferative retinopathy in July of 2007. However, the fact Holland was diagnosed with this condition in his eyes does not automatically make him severely impaired. *See Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990). This diagnosis contained no information about Holland's actual visual acuity, or any limitations which would hinder Holland's eyesight. Beyond the diagnosis, there is no other information about Holland's abilities or the future impact this diagnosis would have on his work or daily life.

In the months following this diagnosis, Holland saw multiple physicians and had multiple examinations by Disability Determination Services. Since his diagnosis, two examining physicians have stated that Holland had "no relevant visual limitations" in their reports. Tr. 247, 260, 264. Further, when examining the records of the doctors Holland visited, there is little evidence that he complained of eye pain or blurred vision. In October 2007, December 2007, January 2008, and February 2008, Holland saw at least two different doctors and complained of a variety of symptoms including lower back pain and depression. Tr. 292, 293, 277, 303. The extensive treatment records

1   included in the record from these doctors either state Holland had "no eye pain at that time" or
2   reflect Holland complained of other symptoms, but not his eye pain. *Id.*  Not one of these treating
3   physicians during this time prescribed any medication or treatment for Holland's eyes.

4   One doctor out of the many Holland saw diagnosed his visual impairment as "severe." There was no additional evidence submitted with this report as to how this diagnosis was reached, or any information about a treatment plan.  Unlike the other records submitted, this diagnosis contained no record of an eye exam or visual acuity test; all Holland submitted was the DDS paper Dr. Syverain completed.  In contrast to Dr. Syverain's diagnosis the record does, however, contain results of a visual acuity exam given to Holland in April 2007 where his results were within normal range at 20/25 in both eyes. Tr. 260.  Because Dr. Syverain's diagnosis differed from the majority of opinions and exam results included in the record, and because this diagnosis was unsupported by further evidence, the ALJ properly gave Dr. Syverain's opinion little weight.

In addition to the lack of treatment and diagnosis records supporting a severe visual impairment, Holland's actions themselves do not show a severe visual impairment.  Indeed, at the time of the hearing, Holland confessed he was "going to see about getting glasses" the next week. Tr. 31.  The only other treatment mentioned in the record for his eyes was eye drops which he told a physician he need to pick up from the pharmacy. Tr. 306.  Holland not only had the time to receive glasses to help with his vision, he had the medical insurance which would pay for his glasses. Tr. 31. His actions appear inconsistent with a person whose claim for disability rests on his inability to see and the intense pain he has in his eyes.  Holland also testified at his hearing that he was currently living with an elderly woman and completed tasks for her which she could not herself. Tr. 32.  This included driving for her, doing her errands, and putting eye drops in her eyes. *Id.*  Holland contends that his visual acuity is severely impaired; however his testimony contradicts this statement.  By his own admission Holland's vision is good enough that he can put eye drops in another persons eyes, drive, and run errands for another person.

Accordingly, Holland's lack of medical treatment and diagnosis for his eyesight combined with his testimony about his current role as a caretaker and his current abilities are substantial evidence that the ALJ was correct in determining Holland's visual impairment was "non-severe."

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT —C-10-02317 RMW
NMJ                                                                 8

1   There is nothing in the record that indicates Holland was seeking continued treatment for his visual
2   impairments, or was hindered by his eyesight for a continuous period of time.

### B. Failure To Obtain The D.O.T. Code

Holland contends the ALJ did not adequately develop the record because he failed to obtain the D.O.T. code for Holland's past job as a merchandiser. Motion at 8.  Holland contends that since there was no description of the visual skills required of a merchandiser, the ALJ could not adequately assess whether or not Holland could perform the job competently. Motion at 8. This argument is unpersuasive because Holland never any provided records showing an impairment in his visual abilities.  The only eye test in the record was one which resulted in a diagnosis of 20/25 vision, which as a doctor stated is "normal visual acuity." Tr. 189, 260.  Besides the normal eye exam, Holland provided no record his eyesight was below normal functioning.  The doctor who diagnosed Holland with "non proliferative retinopathy" did not include any indication or measurement of Holland's visual impairment. Tr. 233.  And the doctor who classified Holland as "severely" visually impaired did not include any tests, procedures, or measurements of Holland's eyesight abilities. Tr. 279. Accordingly, even if the ALJ had the D.O.T. code, he would not have been able to compare it to Holland's actual functional capacity to determine if  Holland could perform the job or not.  Holland complained of "blurred vision" and "eye pain," but did not allege his eyesight was below any sort of functional ability. Tr. 27-33.  Further, Holland even admitted at his hearing that he could see the magazines he was stocking, it just took him extra time to focus on them. *Id.*  For these reasons, Holland has not shown that obtaining the D.O.T. code would have affected the ALJ's determination.  Thus, there is no reversible error in not obtaining the D.O.T. code for Holland's merchandiser job.

### C. Holland's Credibility

Holland asserts the ALJ erred in determining the allegations made by Holland regarding his visual impairment were "not wholly credible." Tr. 15.  Specifically, Holland argues the ALJ erred in step two of his credibility analysis by rejecting claimant's testimony about the severity of his symptoms. Motion at 9.  Holland offers no reason for this error other than that the ALJ's reasons for rejecting the testimony are "not sustainable." Motion at 10.  After reading the ALJ's decision

regarding Holland's symptoms, the court finds the ALJ's decision that Holland was not "wholly credible" is supported by substantial evidence and the ALJ gave specific reasons for rejecting Holland's testimony. As stated by the ALJ, "the level of restrictions on the claimant in most of the physician opinions of record, the level of follow up treatment, including diagnostic testing, ordered by the treating physician, and the claimant's admitted daily activities" were not consistent with Holland's claims he was severely visually impaired. Tr. 15. As discussed above, these findings are supported by substantial evidence in the record.

### IV.  ORDER

For the foregoing reasons, the court denies plaintiff's motion for summary judgment and grants defendant's cross motion for summary judgment.

DATED:     10/4/2011

RONALD M. WHYTE
United States District Judge